UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHRISTOPHER DANIEL BROWN,

            Plaintiff,

v.                                                    Case No. 15-cv-238-pp

KEITH RADER,[1]
ALEXANDRIA COBB, and
LORI JOHSNON,

            Defendants.

---

**DECISION AND ORDER GRANTING DEFENDANT KEITH RADER'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 40), DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 53), DENYING PLAINTIFF'S MOTION FOR EXTENSION OF TIME (DKT. NO. 54), GRANTING DEFENDANT KEITH RADER'S MOTION FOR LEAVE TO FILE A REPLY BRIEF (DKT. NO. 56), AND DIRECTING DEFENDANTS COBB AND JOHNSON TO SUPPLEMENT THEIR MOTION FOR SUMMARY JUDGMENT ON OR BEFORE
MAY 4, 2018**

---

Plaintiff Christopher Daniel Brown, a former Wisconsin state prisoner who is representing himself, filed a case under 42 U.S.C. §1983, alleging that the defendants violated his civil rights at the hospital after his arrest on May 26, 2014. The court screened the plaintiff's amended complaint under 28 U.S.C. §1915A, and allowed him to proceed on Fourth Amendment claims that the plaintiff's blood was drawn without his consent. Dkt. No. 10 at 8-9.

---

[1] The court has changed the caption to reflect the correct spelling of defendant Keith Rader's name and will use the correct spelling throughout this order.

1

On October 7, 2016, the defendants filed separate motions for summary judgment. Dkt. Nos. 35, 40. The court granted the plaintiff's motion for extension of time to respond to those motions, requiring him to respond on or before December 7, 2016. Dkt. No. 47. When the plaintiff did not file a response by that deadline, the court ordered that it would dismiss the case for failure to prosecute on January 13, 2017, unless the plaintiff responded to the motions before that date. Dkt. No. 52.

Before the January 13, 2017 deadline expired, the plaintiff filed a "Motion for Reconsideration of Defendants' Motion for Summary Judgment," dkt. no. 53, wherein he indicated that he had intended to request additional time to file his response; and he enclosed an unsigned "Motion for an Extension of Time to File Reply to Summary Judgment," that the clerk's office docketed on the same day. dkt. no. 54. The plaintiff said that he lost track of time and that the motion for extension of time had been buried under paperwork. Dkt. No. 53. He accepted responsibility for the delay, and advised the court and that he would file his response soon. Id. Less than a week later, on January 3, 2017, the court received the plaintiff's sworn "Motion to Deny Defendants' Request for Summary Judgment," which the clerk's office docketed as his brief in opposition to the defendants' motions for summary judgment. Dkt. No. 55.

The court will deny as unnecessary the plaintiff's motion for reconsideration because there was, at the time he filed it, no order for the court

2

to reconsider; the court had not decided the defendants' motions for summary judgment. The court also will deny the plaintiff's unsigned motion for extension of time, because the Federal Rules of Civil Procedure require people who file motions to sign them. See Fed. R. Civ. P. 11(a). The court will accept and consider the plaintiff's sworn brief in opposition to the defendants' motions for summary judgment. Dkt. No. 55.

On January 17, 2017, defendant Keith Rader filed a motion for leave to file a reply brief, and attached the proposed reply brief in support of his motion for summary judgment. Dkt. No. 56. The court will grant this motion and consider the reply brief.

The court also notes that the motion for summary judgment filed by defendants Alexandria Cobb and Lori Johnson did not comply with (1) Civil Local Rule 56(a), because it did not provide the required notice; and (2) Civil Local Rule 56(b), because the defendants did not file the required statement of proposed material facts. The court concludes, however, that the plaintiff was not prejudiced by these deficiencies. He received the required notices from defendant Rader, and the facts proposed by these defendants were not extensive and were based on the plaintiff's amended complaint, the plaintiff's deposition testimony and Rader's responses to the plaintiff's second interrogatories. Counsel for Cobb and Johnson attached to an affidavit excerpts of the plaintiff's deposition testimony and Rader's responses to the plaintiff's

3

second interrogatories, and submitted them with the motion for summary judgment.

## I. FACTS[2]

On May 26, 2014, City of Cudahy police officers responded to a report of a man threatening to kill his wife. Dkt. No. 42 at ¶3. The police arrested plaintiff Christopher Brown and, despite some resistance from him, took him into custody; the plaintiff was making threats to the officers as this happened. Id. at ¶¶6-12. Once they had the plaintiff in custody, the police took him to the emergency department at Aurora St. Luke's South Shore Hospital (South Shore). Id. at ¶13. South Shore is a privately owned and operated hospital facility owned by Aurora Healthcare. Id. at ¶14.

### A. Rader's Facts

Keith Rader, M.D. worked in the emergency department at South Shore with defendants Alexandria Cobb and Lori Johnson. Id. at ¶2. Rader was an emergency-medicine physician employed by ERMED, S.C., a private physician group contracted by Aurora Healthcare to staff the emergency department at South Shore. Id. at ¶¶1, 16. He had no contractual relationship or other

---

[2] The court takes facts from "Defendant Keith Rader, M.D.'s Proposed Findings of Fact in Support of Motion for Summary Judgment," dkt. no. 42, the "Affidavit of Michael L. Johnson in Support of Motion for Summary Judgment," dkt. no. 38, and the plaintiff's amended complaint, dkt. no. 7, and "Motion to Deny Defendants' Request for Summary Judgment," dkt. no. 55, both of which are sworn. Defendants Cobb and Johnson failed to provide the court with proposed findings of fact.

4

agreement with any governmental body to provide care to arrestees such as the plaintiff. Id. at ¶17.

Defendant Cobb was an emergency medical technician (EMT) at the time. Id. at ¶28. The plaintiff identifies defendant Lori Johnson as "RN Johnson," which implies that she was a nurse. Dkt. No. 7 at 2. Other than that, none of the parties have explained who Johnson is, or her role in the incidents of May 26, 2014.

Rader was the attending physician assigned to care for the plaintiff. Dkt. No. 42 at ¶15. Rader assessed the plaintiff in the patient-care room and found him to be agitated, angry and violent. Id. at ¶18. Rader treated the plaintiff with a five mg/mL injection of Haldol, an antipsychotic medication, and ordered the hospital staff to perform a blood draw and obtain a urine sample. Id. at ¶¶19-20. Rader ordered the blood draw to determine whether the plaintiff had consumed drugs and/or alcohol and, if so, in what amounts, because the consumption of drugs and/or alcohol placed the plaintiff at risk for medical emergencies, including (but not limited to) heart attack, cardiac arrhythmia, stroke and intracranial hemorrhage. Id. at ¶¶23-24. Another purpose of the blood draw was to determine whether the plaintiff's altered behavior was caused by some injury he had sustained, such as from a fall, as opposed to or in addition to the consumption of drugs and/or alcohol. Id. at ¶25.

According to the plaintiff, he had a conversation with Rader, who explained the purpose of the blood draw, but the plaintiff does not recall what Rader said about the blood draw. Id. at ¶¶21-22.

The blood draw was solely a medical decision, and it is one Rader had made countless times in his career under similar circumstances. Id. at ¶26. Rader indicates that he never has had a situation in his career in which a law enforcement officer or a patient's in-custody status has influenced his medical decision-making or judgment. Id. at ¶27. Rader did not order a blood draw for the plaintiff at the behest of, or in consultation with, law enforcement. Id.

As an emergency-medicine physician, Rader has formulated certain customs and practices regarding a patient's refusal to submit to recommended medical care and treatment, including when it relates to blood draws and suspected drug and/or alcohol intoxication. Id. at ¶32. When a patient refuses medical care, Rader first determines whether the patient has the competency and capacity to make an informed decision to refuse medical care and treatment. Id. at ¶33. This requires that the patient demonstrate the ability to clearly understand the risks and benefits of a particular course of action. Id. This is done by an initial evaluation of the patient, which normally includes taking a history and performing a physical exam. Id. Rader then would make recommendations regarding the patient's need for any further evaluation, testing or treatment. Id. Even when the patient refuses care, the patient would

6

still need to show that he understands the decision and the implications of the decision, and that he has the capacity to make an informed decision. Id.

These same customs and practices apply when a patient admits to or exhibits symptoms of drinking alcohol. Id. at ¶34. Such a patient would have to show through his actions and discussions with Rader that he in fact had the capacity to refuse care, such as a blood draw. Id. If a patient is behaving in such a way that there is concern that the patient's actions and decision-making are being affected or altered by ingested substances, that patient would need to show capacity through his actions and discussions with Rader, including the ability to answer questions. Id. It is not necessarily the patient's actions alone that determine capacity; the patient's ability to show that he understands what he is doing and the implications of his actions is also important. Id. This is true not only of patients with possible drug or alcohol ingestions, but also of patients with head injuries, stroke, and many other medical conditions. Id.

If a patient who presents with possible ingestion of alcohol is acting violently and uncontrollably and not answering questions in such a way that Rader is able to determine that he has the capacity to make an informed decision regarding care, Rader makes efforts to confirm that there are no potential medical risks to the patient. Id. at ¶35. For such patients, there is always concern for ingestion of other medications or drugs, which could place the patient at a very serious risk for medical emergencies such as heart attack,

7

cardiac arrhythmia, stroke or intracranial hemorrhage. Id. Immediate evaluation through a thorough physical exam, history, and various testing, including blood testing, often is necessary, because simply waiting to see if the patient has a potentially catastrophic event is not in the patient's best interest. Id. Additionally, patients who have been consuming alcohol are at risk for falls, and altered behavior may result from other injuries, such as from a fall, which no one witnessed, and which would require further evaluation. Id.

Despite the plaintiff's refusal, but consistent with Rader's custom and practice, the plaintiff's blood was drawn. Id. at ¶36. Rader asserts that Cobb drew the blood. Id. at ¶¶28, 37. The laboratory analysis of the plaintiff's blood revealed a level of .376 grams of alcohol per 100mL of blood but no other intoxicating substances. Id. at ¶40.

Following the blood draw, the plaintiff received a two mg injection of Ativan, a benzodiazepine medication, and another five mg/mL injection of Haldol. Id. at ¶38. The plaintiff continued to be physically and verbally aggressive, but eventually fell asleep. Id. at ¶¶39, 41. When the plaintiff awoke, his behavior no longer displayed imminent danger to others, so his restraints were released. Id. at ¶42. He left the emergency department at 10:31 p.m. in police custody. Id. at ¶43.

B.  Plaintiff's Facts

In his June 1, 2015 amended complaint, the plaintiff asserted that when he arrived at the hospital and met with Rader and Johnson, he did told them

8

that he did not consent to any blood draws, and that they would need a warrant to draw his blood. He alleged that they drew blood over his protests. Dkt. No. 7 at 2. He alleged that after Rader and Johnson left the room, Cobb claimed that the plaintiff spit on her scrubs. Id. He alleged that after Cobb left the room, one of the officers—Officer Jachowicz (not a defendant) put a pillow over his face, then put a spit mask over his face. Id. The complaint alleged that after Cobb returned to the room, Cobb took his blood. It also alleged that "with the permission and consent" of the Cudahy Police Department, Rader sedated him. Id. at 3.

In his brief in opposition to the defendants' summary judgment motions, the plaintiff reiterated that he did not consent to a warrantless blood draw. Dkt. No. 55 at 2. He also reiterated that the officers held him down, covered his face with a pillow and then put a spit mask on him. Id. He asserts that Cobb told him that the police wanted the blood drawn. Id. The plaintiff disagrees with Rader's characterization that Rader did not order the blood draw at the behest of the police. Id. He argues that Rader did not question the police about the plaintiff's agitated state (despite the fact that the police had seen the plaintiff in this state before), and that Rader conducted medical procedures such as ordering the blood draw and giving him medication without properly researching the plaintiff's condition or questioning the plaintiff about his condition. Id. at 2-3.

9

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed, or is genuinely disputed, must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Fourth Amendment Standard

In its order screening the plaintiff's amended complaint, the court allowed the plaintiff to proceed on a single claim—that Rader, Johnson and Cobb violated the Fourth Amendment in drawing the plaintiff's blood without his consent. Dkt. No. 10 at 8-9.

A blood draw is a search of a person, so it is limited by the Fourth Amendment. Missouri v. McNeely, 569 U.S. 141, 148 (2013). See also Birchfield v. N. Dakota, ___ U.S. ___, 136 S. Ct. 2160 (2016). "Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" McNeely, 569 U.S. at 148 (quoting Winston v. Lee, 470 U.S. 753, 760 (1985)). A warrantless search is reasonable only if it falls within a recognized Fourth Amendment exception. Id. One such possible exception is the "exigent circumstances" exception to the Fourth Amendment's warrant requirement, which allows law enforcement to search without a warrant "when an emergency leaves police insufficient time to seek a warrant." Birchfield, 136 S. Ct. at 2173 (citing Michigan v. Tyler, 436 U.S. 499, 509 (1978)).

Several Supreme Court cases have considered the question of whether it is a violation of the Fourth Amendment for a law enforcement officer to require a citizen to submit to a blood draw without first obtaining a warrant. See, *e.g.*, Schmerber v. California, 384 U.S. 757 (1966); McNeely, 569 U.S. 141 (2013); Birchfield, 136 S. Ct. 2160 (2016). The Court also has considered the question

11

in the context of government employers mandating drug or alcohol testing. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602 (1989). The Seventh Circuit Court of Appeals also has considered situations in which police officers order warrantless blood draws, see Gerhartz v. Richert, 779 F.3d 682 (7th Cir. 2015), and situations in which convicted defendants are required to provide DNA samples, see Green v. Berge, 354 F.3d 675 (7th Cir. 2004).

  C. Rader

Rader's primary argument is that he was not acting under color of state law when he ordered the blood draw. "When a plaintiff brings a section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law." Rodriguez v. Plymouth Ambulance Service, 577 F.3d 816, 822 (7th Cir. 2009). "At its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" Id. at 823 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)).

"Whether a medical provider is a state actor is a functional inquiry, focusing on the relationship between the state, the medical provider, and the prisoner." Shields v. Ill. Dept. of Corrs., 746 F.3d 782, 797 (7th Cir. 2014) (citing Rodriguez, 577 F.3d at 826). In Shields, the Seventh Circuit drew a distinction between (1) a business that contracts to provide medical care to prisoners and thus acts under the color of state law, and (2) "medical providers

12

who have 'only an incidental or transitory relationship' with the penal system generally [and] are not considered state actors." Id. at 797-98 (citing Rodriguez, 577 F.3d at 827.

Rader has presented evidence that he is an emergency-medicine physician employed by a private physician group that contracts with Aurora Healthcare to staff the emergency department at South Shore Hospital. He has shown—and the plaintiff has not disputed—that neither Rader nor his employer had a contractual agreement or other agreement with any governmental body (such as the Cudahy Police) to provide care to arrestees. The undisputed evidence shows that Rader was acting in his capacity as a private hospital physician when he interacted with the plaintiff.

The plaintiff has submitted no evidence to contradict Rader's showing that Rader is not a state actor; nor has he submitted evidence to contradict Rader's showing that he ordered the blood draw for medical reasons. The plaintiff states that he "does not agree" that Rader ordered the blood draw for medical purposes, but does not provide any evidence to support that disagreement. He alleges that "the defendants" "cooperated" with the police department to forcefully draw his blood, but neither the evidence nor his own complaint support that argument. The plaintiff argues that the officers' involvement in restraining him while Cobb drew his blood transformed the blood draw into a state action.

Even considering the evidence in the light most favorable to the plaintiff, the police officers did not restrain him until *after* Rader had ordered the blood draw. The plaintiff's own facts state that Rader ordered the blood draw (over the plaintiff's protests) and then left the room. The complaint does not allege that Rader talked with the police before ordering the blood draw. In fact, in his opposition brief, the plaintiff complains that Rader *did not* talk to the police about him, and *did not* try to collect information about him from the police. Dkt. No. 55 at 2-3. The plaintiff's facts assert that *after* Rader had ordered the blood draw and left the room, the police officers held him down while Cobb took his blood. Actions that the officers took after Rader had ordered the blood draw and left the room do not convert Rader into a state actor.

The plaintiff also argues that Rader was responsible for what the police officers did after Rader gave the order for the blood draw and left the room. He says that, "[w]hen one gives and [sic] order he is just as responsible for such an order as the person that carried it out, regardless if they were there or not." Id. at 2. The plaintiff says that it was Rader's responsibility to make sure "no civil or criminal actions were committed during the following of his orders," and he alleges that Rader did not live up to that responsibility, and thus was "negligent in his actions." Id.

This argument undermines the plaintiff's claim against Rader. The plaintiff's argument amounts to a claim that Rader ordered the blood draw, and that the officers were acting on his orders, not the other way around. Rader

14

was not the state actor; state actors, according to the plaintiff, were assisting *Rader* in carrying out his *medical* orders. Further, even if somehow the plaintiff could show that Rader was negligent for not staying in the room with the plaintiff after giving the order, negligence is not sufficient to show a violation of constitutional rights under §1983—not even for state actors. Burton v. Downey, 805 F.3d 776, 786 (7th Cir. 2015) ("Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough.") (quoting Shockley v. Jones, 823 F.2d 1068, 1072 (7th Cir. 1987)).

The plaintiff has provided no evidence to support his claim that Rader was acting under color of state law when he ordered the blood draw. The plaintiff has presented only the kind of "conclusory" statements and assertions that the Seventh Circuit has said will not suffice to stave off summary judgment. Because the plaintiff has not demonstrated that Rader was a state actor, Rader is entitled to judgment as a matter of law. The court will grant summary judgment in favor of Rader.

### D. Cobb and Johnson

In their summary judgment motion, Cobb and Johnson also argue that they are not state actors. Dkt. No. 36 at 8. But neither of these defendants provided the court with any evidence in support of their claims. They submitted no proposed findings of fact. They presented an affidavit from their attorney, and a copy of the transcript of the plaintiff's deposition. Neither of these items constitute evidence of their claims that they were not state actors.

15

Rader attested in his proposed findings of fact that he worked in the emergency department at South Shore Hospital, and that Cobb was the "EMT" who drew the plaintiff's blood. He did not say, however, whether Cobb was employed by the hospital, or by another company. He did not identify Johnson. Neither Cobb nor Johnson submitted affidavits or other evidence proving the identities of their employers or their relationships with any governmental entity.

The court cannot rule on Cobb and Johnson's motion for summary judgment without more information. The court strongly urges Cobb and Johnson to review this court's local rules, particularly Civil L.R. 56, and to provide the court with the information required by that rule. The court will give these two defendants an opportunity to provide evidence, but it will *not* allow them to supplement their brief.

### III. CONCLUSION

The court **DENIES** as unnecessary the plaintiff's motion for reconsideration of defendants' motion for summary judgment. Dkt. No. 53.

The court **DENIES** the plaintiff's motion for extension of time. Dkt. No. 54.

The court **GRANTS** defendant Keith Rader's motion for leave to file a reply brief, *nunc pro tunc* to January 17, 2017. Dkt. No. 56.

The court **GRANTS** defendant Keith Rader's motion for summary judgment. Dkt. No. 40.

16

The court **ORDERS** that Keith Rader is **DISMISSED** as a defendant.

The court **ORDERS** defendants Alexandria Cobb and Lori Johnson to provide evidence in support of their motion for summary judgment by the end of the day on **May 4, 2018.** If these defendants provide the evidence the court needs, the plaintiff may file a response to the evidence in time for the court to receive it by the end of the day on **June 1, 2018.**

Dated in Milwaukee, Wisconsin this 30th day of March, 2018.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER
United States District Judge**

17

Case 2:15-cv-00238-PP   Filed 03/30/18   Page 17 of 17   Document 57